IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

UNITED STATES OF AMERICA,

   Plaintiff,

  vs.         No. CR16-0057-CJW

TYLER KONIGSMARK,     TRANSCRIPT OF
             SENTENCING
   Defendant.
_____/


   The Sentencing held before the Honorable Mark W. Bennett, Judge of the United States District Court for the Northern District of Iowa, at the Federal Courthouse, 111 Seventh Avenue Southeast, Cedar Rapids, Iowa, December 1, 2016, commencing at 10 a.m.


APPEARANCES

For the Plaintiff:  MARK A. TREMMEL, ESQ.
        Assistant United States Attorney
        111 Seventh Avenue Southeast
        Cedar Rapids, IA 52401

For the Defendant:  CHRISTOPHER J. NATHAN, ESQ.
        Assistant Federal Defender
        Suite 290
        222 Third Avenue Southeast
        Cedar Rapids, IA  52401

Also present:   Jennifer Elliott, U.S. Probation

Reported by:   Shelly Semmler, RMR, CRR
        320 Sixth Street
        Sioux City, IA  51101
        (712) 233-3846

```
1              THE COURT:  Good morning.  Please be seated.
2              THE CLERK:  This is Case Number 16CR57, the
3  United States of America versus Tyler Konigsmark.  The
4  United States Probation Office is represented via
5  telephone by Jennifer Elliott.  Counsel, please state
6  your appearances.
7              MR. TREMMEL:  Mark Tremmel, U.S. Attorney's
8  Office.
9              THE COURT:  Good morning again, Mr. Tremmel.
10             MR. NATHAN:  For Mr. Konigsmark who is present
11  in court, Christopher Nathan.
12             THE COURT:  Good morning, Mr. Nathan.
13     Mr. Nathan, have you had a full, fair, and complete
14  opportunity to review the presentence report and the
15  sentencing worksheet with your client?
16             MR. NATHAN:  Yes, Your Honor.
17             THE COURT:  And this is scored as a total
18  offense level 43, criminal history category 1, statutory
19  provision of a 120-month mandatory minimum up to a
20  statutory maximum life sentence, and the advisory United
21  States Sentencing Guideline range comes out at life, and
22  I understand there are no objections to the guideline
23  calculations.  Is that correct?
24             MR. NATHAN:  Yes, Your Honor.
25             THE COURT:  And is that correct, Mr. Tremmel?
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Reproduction without permission is prohibited by law.*
Case 1:16-cr-00057-CJW-MAR   Document 64   Filed 08/20/20   Page 2 of 71

```
1              MR. TREMMEL:  Yes, Your Honor.
2              THE COURT:  Okay.  Do you have evidence that
3   you intend to offer, Mr. Nathan?
4              MR. NATHAN:  Yes, Your Honor.
5              THE COURT:  Would you like to proceed with that
6   evidence?
7              MR. NATHAN:  Yes, Your Honor.  First I'd ask
8   the Court to sustain the defense objections to the
9   presentence report.  Those are objections 1 through 5.
10             THE COURT:  What's the government's position?
11             MR. TREMMEL:  Your Honor, regarding the
12  objections to paragraphs 9, 10, 11, and 16, the parties
13  have discussed those objections, and the defendant does
14  not dispute that in their interviews the two minors made
15  the statements in these paragraphs.  However, he does
16  object to the factual accuracy of the objected-to
17  statements.  So that's -- that was our understanding was
18  he's not objecting that they made the statements.  He has
19  a different version of that.
20             THE COURT:  Now, is that your understanding of
21  the nature of your objections, Mr. Nathan?
22             MR. NATHAN:  My understanding is that denial of
23  their factual accuracy is a denial.
24             THE COURT:  Did you two discuss this prior to
25  the hearing?  Apparently not.  I think there's a
```

Case 1:16-cr-00057-CJW-MAR   Document 64   Filed 08/20/20   Page 3 of 71

```
 1   misunderstanding between the two of you as to what the
 2   nature of the objection was.  My understanding is
 3   Mr. Tremmel understands it as you're not denying that
 4   they made it.  You're just denying that they're true.
 5   But your position, Mr. Nathan, is it's just a flat
 6   objection and, therefore, puts the government to its
 7   burden of proof that the statements were actually made
 8   and then I would have to decide the veracity of the
 9   statements.
10           MR. NATHAN:  Then I apologize.  Mr. Tremmel is
11   accurately reflecting the nature of our conversation.  We
12   acknowledge the statements were made, but we deny their
13   factual accuracy.
14           THE COURT:  Oh, okay.  So then there's no
15   disagreement.
16           MR. TREMMEL:  That's correct, Your Honor.
17           THE COURT:  Okay.  There appeared to be, didn't
18   there?
19           MR. TREMMEL:  I wasn't sure from the record
20   here, but I think that's been cleared up, Your Honor.
21           THE COURT:  Okay.  Okay.  Is the government
22   calling any witnesses in this case?
23           MR. TREMMEL:  No witnesses, Your Honor.
24           THE COURT:  Will there be any victim impact
25   testimony?
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*No further redistribution of this transcript is permitted.*

Case 1:16-cr-00057-CJW-MAR   Document 64   Filed 08/20/20   Page 4 of 71

```
 1          MR. TREMMEL:  No victim impact testimony, Your

 2   Honor.

 3          THE COURT:  No?

 4          MR. TREMMEL:  That's correct.

 5          THE COURT:  Okay.

 6          MR. TREMMEL:  We do have one stipulation, Your

 7   Honor.

 8          THE COURT:  Yes.  Why don't you proceed with

 9   that stipulation.

10          MR. TREMMEL:  The parties have agreed to

11   stipulate that the busses the three victims rode on

12   carried students from the sixth, seventh, and eighth

13   grades.

14          THE COURT:  And, Mr. Nathan, you agreed with

15   that?

16          MR. NATHAN:  Yes, Your Honor.

17          THE COURT:  Okay.  Then that's part of the

18   factual record and taken as true.

19       Does the defense have any evidence you'd like to

20   offer?

21          MR. NATHAN:  Yes, Your Honor.  First the

22   defense also offers a stipulation.

23          THE COURT:  Please proceed.

24          MR. NATHAN:  That on May 16 when the defendant

25   was interviewed by law enforcement with respect to the
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*No purchase is complete until a copy of the transcript is paid*
Case 1:16-cr-00057-CJW-MAR   Document 64   Filed 08/20/20   Page 5 of 71

1 instant offense that the defendant asked to apologize to

2 the victim A.P.

3      THE COURT:  And is the government willing to

4 stipulate to that?

5      MR. TREMMEL:  Yes, Your Honor.

6      THE COURT:  Okay.  Then that is accepted as

7 true as well.

8    You have some exhibits you need to offer?

9      MR. NATHAN:  At this time the defense moves to

10 admit Exhibits A through E.

11               *   *   *   *

12      (Exhibits A through E were offered.)

13               *   *   *   *

14      THE COURT:  Any objection to Defendant's

15 Exhibits A through E, Mr. Tremmel?

16      MR. TREMMEL:  No, Your Honor.

17      THE COURT:  Defendant's Exhibits A through E

18 are admitted.

19               *   *   *   *

20      (Defendant Exhibits A through E were admitted.)

21               *   *   *   *

22      THE COURT:  And I believe you're calling a live

23 witness?

24      MR. NATHAN:  Yes, Your Honor.

25      THE COURT:  Okay.  You may proceed.

```
1            MR. NATHAN:  The defense calls Dr. Konar.
2            THE COURT:  Thank you.  Doctor, if you'd just
3  come up here by the witness box which is over here, then
4  I'll swear you in.  Good morning.  Would you raise your
5  right hand, please.
6            ARTHUR KONAR, DEFENDANT'S WITNESS, SWORN
7            THE COURT:  Thank you.  Please be seated in the
8  witness box there and -- oh, how kind of you to have your
9  card.  Thank you.  Nope, it's over there.  It's in a
10 little different place than most courtrooms.  And you can
11 adjust the chair and the microphone so you can speak
12 directly into the microphone.  And would you tell us your
13 name, please, and spell your last name.
14           THE WITNESS:  Dr. Arthur Konar, K-o-n-a-r.
15           THE COURT:  Your parents had a lot of
16 foresight.  They put "doctor" on your birth certificate?
17           THE WITNESS:  Arthur H. Konar, Your Honor.
18           THE COURT:  Right.  Yeah, I didn't ask your
19 title.  I asked your name.  They're quite different.
20           THE WITNESS:  That is correct, Your Honor.
21           THE COURT:  My parents didn't have the same
22 foresight either.  They didn't put "judge" on my birth
23 certificate.  Thank you.
24      Mr. Nathan, you may proceed.
25           MR. NATHAN:  Thank you, Your Honor.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Reproduction of transcript forbidden without authorization.*

Case 1:16-cr-00057-CJW-MAR   Document 64   Filed 08/20/20   Page 7 of 71

```
 1                    DIRECT EXAMINATION

 2  BY MR. NATHAN:

 3  Q.    Good morning, sir.

 4  A.    Good morning.

 5  Q.    Could you please state your profession.

 6  A.    I am a licensed psychologist in the state of Iowa.

 7  Q.    Could you also state your education and any titles

 8  that you may hold.

 9  A.    Of course.  I received a bachelor's degree from

10  Oberlin College in Ohio in biology and psychology.  I

11  went on to get a master's degree in developmental

12  psychology at Columbia University in New York City.  And

13  then I got a Ph.D. in counselling psychology at the

14  University of Missouri at Columbia.

15        I went on to do a postdoctoral fellowship over -- in

16  clinical neuropsychology through the commonwealth of

17  Virginia and the Hunter Holmes McGuire VA Medical Center

18  in Richmond, Virginia, and have worked as a psychologist

19  and as a clinical neuropsychologist in the states of

20  Nebraska and Iowa since 1986.

21  Q.    Thank you.  Could you also describe your experience

22  in psychology, practical.

23  A.    I -- in the 1980s I worked as -- primarily as a

24  clinical neuropsychologist at Immanuel Medical Center and

25  at Madonna Rehabilitation Center in Omaha and Lincoln,
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Reproduction of transcript by copy or otherwise prohibited.*

Case 1:16-cr-00057-CJW-MAR    Document 64    Filed 08/20/20    Page 8 of 71

Nebraska, respectively.  I had different positions
including running a postdoc fellowship at the Immanuel
Medical Center in Omaha.  And I also had held a position
over at St. Joseph Center for Mental Health in Omaha,
Nebraska.

Starting in the 1990s, I began a private practice in
Lincoln, Nebraska, which I had through 1998 when we moved
to Iowa.  In that practice I provided evaluations, saw
therapy clients, as well as was a clinical consultant and
a supervisor in an APA-approved clinical internship at
the Rivendell Psychiatric Center in Seward, Nebraska.

My wife and I moved to Ames, Iowa, in 1998, and I've
been a practicing psychologist in Iowa since then.
During that time period from 1998 through 2014, in
addition to being a psychologist, a practicing
psychologist, I was a lecturer and then in 2006 got
promoted to a senior lecturer at Iowa State University
where I taught graduate students in their APA-approved
counselling psychology program in psychological
assessment, in all forms of psychological assessment,
with classes in intelligence and memory testing,
personality testing, general psychological assessment,
and introduction to psychological assessment.

I also taught classes, large classes, to
undergraduate classes as well as small classes, and those

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
No purchase to report.  Copy not for distribution.

Case 1:16-cr-00057-CJW-MAR   Document 64   Filed 08/20/20   Page 9 of 71

1    classes included about 14 sections of abnormal

2    psychology, a 400-level course.  I designed and taught a

3    class in abnormal psychology in children and adolescents,

4    a 300-level course, and also taught seminars in forensic

5    psychology and in introduction to professional psychology

6    to undergraduates at Iowa State University.

7    Q.    Thank you.  What is clinical neuropsychology?

8    A.    Clinical neuropsychology is a subspecialty of

9    psychology or clinical psychology which looks at

10   attempting to do a psychological evaluation which would

11   be a functional analysis of brain behavior types of

12   insults or problems.  Those problems can either be

13   acquired types of problems through things like having a

14   closed head injury or a cerebral vascular accident.  Or

15   they can be problems which occur that are more

16   developmental such as things like ADHD or various -- or

17   Asperger's disorder, autism, et cetera.

18   Q.    At my request did you interview Mr. Konigsmark?

19   A.    Yes, I did.

20   Q.    Now, the interview or evaluation that you conducted

21   of Mr. Konigsmark, was that a clinical neuropsychological

22   evaluation?

23   A.    No, it was not.

24   Q.    What was it?

25   A.    It was really more of a straight psychological

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Reported with computer-aided transcription*
Case 1:16-cr-00057-CJW-MAR   Document 64   Filed 08/20/20   Page 10 of 71

 1   evaluation, a clinical psychological evaluation, in which

 2   I proceeded with an interview, with IQ testing, with

 3   personality testing, with self-reports as well as being

 4   able to go through various available medical records.

 5   Q.   Did you produce a written report based on that

 6   interview?

 7   A.   Yes, I did.

 8   Q.   Does the report reflect your professional opinion or

 9   opinions based on your evaluation of Mr. Konigsmark?

10   A.   Yes, it does.

11   Q.   Now, I believe you mentioned as part of your

12   evaluation or interview of Mr. Konigsmark that you

13   administered some tests to him?

14   A.   Yes, I did.

15   Q.   What tests did you administer, and can you describe

16   them, please.

17   A.   Absolutely.  There are differences between formal

18   and informal tests.  And the formal tests which I

19   administered would be an individualized intelligence test

20   called the Wechsler -- and that's W-e-c-h-l -- s-l-e-r --

21   Adult Intelligence Scale Fourth Edition, the MMPI-2.  And

22   that would be the Minnesota Multiphasic Personality

23   Inventory Second Edition.  I also gave him the -- a

24   self-report instrument called the Beck Depression

25   Inventory II.  And then finally we had a clinical

*Contact Shelly Semmler at 712-233-3841 or shelly_semmler@iand.uscourts.gov*
*Reported with computer-aided transcription*
Case 1:16-cr-00057-CJW-MAR   Document 84   Filed 08/20/20   Page 11 of 71

interview as well as doing a more informal mental status
evaluation.

Q.   Okay.  Taking those formal and informal tests or
interviews one at a time, can you please describe or
explain what they are and why you administered them.

A.   Of course.  Let's start off with the interview
because that's kind of the easiest thing to do.  A
clinical interview is more than simply sitting down and
talking to a person.  A clinical interview is --
especially when you're doing something in a forensic
setting such as this, you have to consider both the
nature of the charges and that person's role within the
charges.

     So you talk to him a little bit about his
understanding in terms of what he's been charged with, is
he following what he's been charged with, does he
understand, you know, how he is proceeding, how he is
working with his attorney, et cetera.

     At that point after that you really move more into a
straight clinical type of interview where you get a
person's history.  You find out in terms of where they
came from, what their early experiences were like, what
their family situation was like, what their early
academic type of situation was like, et cetera, and go
through various types of -- types of symptomatology that

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Reported in Steno-Computer-Aided Transcription*
Case 1:16-cr-00057-CJW-MAR   Document 94   Filed 08/20/20   Page 12 of 71

1  appear to be coming on up, really starting off with types

2  of diagnoses which would be the most severe.

3      So you rule out things like psychosis or bipolar

4  disorders which turned out to be not present for this

5  person and then kind of move into other types of

6  diagnostic criteria, going through the list, trying to

7  gain information about that.

8      And as part of the interview process or at least as

9  part of the way I have been trained and developed to do

10 the interview process, you don't simply ask the question

11 and then check it off a list because, candidly, people

12 can tell you what they want to tell you.  You do a lot of

13 observations during that, and when you have questions,

14 you come back and circle around and try to get more

15 information again.

16     In addition to that, I performed what would be

17 considered a mental status evaluation.  A mental status

18 evaluation is really trying to look at kind of basic

19 functioning and sensorium.  So you ask the person, for

20 example, in terms of issues with hallucinations and

21 delusions, you look at things like, you know, how well

22 they're able to track with you.  You look at issues in

23 terms of can they develop some level of abstract

24 thinking.  You look at very short-term memory functions.

25 You also look at memory functions that may exist with

*Contact Shelly Semmler at 712-233-3840 or shelly_semmler@iand.uscourts.gov*
*Appalachian Reporters Transcribing*
Case 1:16-cr-00057-CJW-MAR   Document 94   Filed 08/20/20   Page 13 of 71

different sorts of interference, basically how well is
that person able to interact and function in just the
most basic manner.

The Wechsler test is an individualized administered
intelligence test, and it's really based off of David
Wechsler's definition of intelligence which is a person's
ability to think rationally, deal effectively, and --
and -- act rationally, deal effectively, and act
purposefully with his or her own environment.

And in doing so it's set up with ten different types
of subtests.  You administer these subtests in a
standardized manner, score up the test, and end up with
four different sorts of indices as well as a final IQ
score which can give you information about the
person's -- not only the person's general intelligence
but in terms of their strengths and weaknesses.  And it
can also give you information in regards to what may be
some possible diagnostic types of issues both in terms of
intellectual abilities as well as learning types of
problems.

Finally I administered the Minnesota Multiphasic
Personality Inventory.  That test is the gold standard in
terms of looking at different sorts of clinical types of
problems and issues.  It's an empirically based test, the
most researched personality inventory in the country and

Case 1:16-cr-00057-CJW-MAR   Document 64   Filed 08/20/20   Page 14 of 71

 1    in the world.  And this is one which you can look at

 2    different sorts of scale elevations and, based on a

 3    person's elevations and lack thereof, make some

 4    assessments not only in terms of diagnoses for the

 5    possible clinical types of problems but also get a better

 6    sense in terms of how does this person function and under

 7    stress how is this person going to react in appropriate

 8    manners.

 9    Q.    Thank you.  Based on your administration of the

10    clinical interview and the mental status evaluation, what

11    did you find and conclude?

12    A.    Well, I wouldn't say that I necessarily concluded

13    anything from simply any one specific part because when

14    you do a psychological evaluation, the conclusions really

15    come from an integration of everything.  But certainly

16    what I can state from what I found on -- out from the

17    interview and the -- and the mental status evaluation was

18    that Tyler did not suffer from any type of psychosis.

19    And of that I was sure.

20          And what I also found out was that it was pretty

21    clear that he was an individual who was experiencing a

22    fair amount of anxiety, a lot of depression.

23          There was certainly a likelihood of ADHD, though I

24    couldn't determine that simply from that and that he was

25    operating in all likelihood with lower intellectual

*Contact Shelly Semmler at 712-233-3840 or shelly_semmler@iand.uscourts.gov*
*Reported by Shelly Semmler, RMR, CRR*
Case 1:16-cr-00057-CJW-MAR   Document 94   Filed 08/20/20   Page 15 of 71

functioning.  Lower intellectual functioning does not in any way, shape, or form mean that he would be diagnosed with, quote, a mild intellectual disability which in prior renditions of diagnostic manuals would have been considered mental retardation.

But it was certainly pretty clear to me that this was an individual who was, at the very best, below average and possibly more on the borderline region.  But, again, I couldn't necessarily conclude that without doing the further tests.

Q.    Okay.  Then based on your further examination of Mr. Konigsmark, by which I mean the administration of the Wechsler test and the MMPI-2, what did you find and conclude, doctor?

A.    What I found and conclude, that Tyler did and, in fact, suffer from ADHD which was also later defined out in his school records, and that offered some corroboration with that, that he suffered from a depressive disorder as well as an anxiety disorder, that he had learning problems and would be classified as borderline intellectual functioning.

Q.    Doctor, were you able to form an opinion as to whether Mr. Konigsmark is attracted to prepubescent persons?

A.    Yes, I was.

1   Q.    What is your opinion, doctor?

2   A.    My opinion is that he is not inherently a pedophile.

3   He is not diagnosed as being a pedophile and, therefore,

4   would not be necessarily attracted to prepubescent

5   females.

6   Q.    My understanding is that pedophilia or the

7   pedophilic condition refers to sexual conduct with a

8   person under the age of 13.  And, of course, this case

9   involved a 12-year-old.

10  A.    Correct.

11  Q.    Given that, could you please explain further what

12  you mean that you found that Mr. Konigsmark does not have

13  an attraction to prepubescent minors.

14  A.    Yes.  I -- my finding in no way attempts to diminish

15  or mock the behaviors which Mr. Konigsmark discussed with

16  me or which he is charged with.  I personally find them

17  to be repugnant.  It's really looking at a pattern of

18  behavior.

19       And so my findings are not based on the -- on the

20  specifics of the actions that were taken and which were

21  admitted to during this time period but rather looking at

22  a pattern of his behavior and trying to come up with a

23  more comprehensive understanding in terms of why these

24  behaviors existed.

25       Individuals who I would clinically diagnose with

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Reported with computer-aided transcription*
Case 1:16-cr-00057-CJW-MAR   Document 94   Filed 08/20/20   Page 17 of 71

       1  pedophilia which I've done on multiple occasions in the

       2  past are individuals who really have this predisposition

       3  and this pattern of behavior to act in some way.  This

       4  was clearly not the case with Mr. Konigsmark.

       5  Q.   Were you able to form an opinion as to whether

       6  Mr. Konigsmark is likely to commit further sex crimes

       7  upon his release from imprisonment?

       8  A.   Yes, I was.

       9  Q.   What is that opinion, doctor?

      10  A.   That opinion is that he is not likely to further

      11  commit these sex crimes.

      12  Q.   What is that based on?

      13  A.   Once again, when one does a psychological

      14  evaluation, what you look at are both patterns and

      15  behaviors as well as redundancies.  Mr. Konigsmark --

      16  there are really kind of two factors which drove me to

      17  that, one of which is the absence of behavior and one of

      18  which is the presence of alternative types of

      19  understandings.

      20       Mr. Konigsmark is an individual with both ADHD, low

      21  self-esteem, as well as poor intellectual functioning.

      22  He's a person who is really operating at a mental age

      23  which is much lower and has struggled with impulse

      24  control and organizational issues that would be prominent

      25  with ADHD.

       So these are more parsimonious explanations as well
as just the contextual issues in terms of some of the
shame that he was involved with prior to doing -- to
engaging in these acts.

       And the other part is, quite honestly, the absence
of behavior, and the absence of behavior is that in
regards to his -- to his prior functioning before he was
a bus student attendant, there is no documentation in
regards to the fact that he was involved sexually or
interested sexually in females much younger than him.  In
fact, the prior sexual types of interactions he's had
have all been with females that have been age
appropriate.  Or I don't even want to say age appropriate
because I don't think it's necessarily appropriate to
have sex at a younger teenage age but with age cohorts to
his -- to his behaviors.

Q.   Now, you mentioned Mr. Konigsmark's mental or
intellectual age.  In your opinion what is
Mr. Konigsmark's mental or intellectual age?

A.   I would place him somewhere between 12 and 14 years
of age.

Q.   Doctor, just to back up for a second, you mentioned
that you administered these tests to Mr. Konigsmark, and
then did the defense provide you with additional records
from the Cedar Rapids School District about

1  Mr. Konigsmark?

2  A.    Yes, they did.

3  Q.    And just to highlight portions of those records, did

4  those records include that when Mr. Konigsmark was in the

5  fourth grade that he was evaluated for level of

6  performance and that the evaluation revealed that in

7  fourth grade he was functioning at the first-grade level?

8  A.    Yes.

9  Q.    And even earlier when he was in kindergarten and age

10  6, was he administered a different version of the

11  Wechsler test?

12  A.    Correct.  From ages 6 to 16, you can be given the

13  Wechsler Intelligence Scale For Children.  The current

14  iteration of that is the WISC-V, but this was a long time

15  ago, and the version that he was given was the WISC-III.

16  Q.    And when Tyler -- excuse me.  When Mr. Konigsmark

17  was tested in kindergarten at age 6, among his scores,

18  did he test in the fifth percentile, in the second

19  percentile, and in the first percentile in comparison

20  with peer-aged children?

21  A.    Yes.

22  Q.    Did you find it significant that the records from

23  the Cedar Rapids School District and the prior testing of

24  Mr. Konigsmark in part confirmed or in whole confirmed

25  your own evaluation of Mr. Konigsmark?

Case 1:16-cr-00057-CJW-MAR    Document 94    Filed 08/20/20    Page 20 of 71

1  A.   As you mentioned, yes, I did.  As you mentioned, I

2  was not given that material until after I wrote my

3  report.  The reliability between tests given at age -- an

4  IQ test given at age 5 or 6 -- actually I think it was 6

5  versus an IQ test given at age 20 is going to be

6  relative -- is going to have a high error of measurement

7  because there's a lot of changes that occur.  And it was

8  striking how similar the tests were and, quite honestly,

9  offered validation to the scores that I had were an

10 accurate portrayal in terms of how he was -- in terms of

11 what his skill set is.

12 Q.   In your review of the school records, did the

13 records also reveal that as part of his what I'll call an

14 educational plan that the school district considered

15 attaching a bungee cord between Tyler and his desk?

16 A.   I did read that, yes.

17 Q.   Is that consistent with the diagnosis of ADHD?

18 A.   Well, it's certainly -- yes, it would be.  I

19 would -- for the record I would find that practice to be

20 a very bad idea in that it would just create a lot of

21 shame for that student.  But that's not the question

22 asked, so I apologize for that commentary.

23      I found that the -- that placing a bungee cord on

24 the desk, the only way you can really look at that as

25 being true is that this would be a child who simply could

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Reported by Shelly Semmler, Official Court Reporter*

Case 1:16-cr-00057-CJW-MAR   Document 64   Filed 08/20/20   Page 21 of 71

1  not or would not stay in their seat and, therefore, this

2  was a way to keep them more stationary.  And the

3  inability to stay in your seat, the inability to exhibit

4  good impulse control even as an elementary school child

5  is very indicative of a child -- it doesn't mean that he

6  has ADHD, but it certainly would be indicative of a child

7  who does have ADHD.

8  Q.   Did your further review of the school records reveal

9  that Tyler at some point was placed into what's called a

10  504 program?

11  A.   Correct.

12  Q.   What is the 504 program?

13  A.   There are essentially two types of school programs

14  that you can have for -- to get additional services.  One

15  would be a direct IEP or an Individualized Educational

16  Program, and one would be a 504 program.

17       A 504 program is one in which an outside agency is

18  going to determine that that child is one that has

19  special needs and that these special needs need to be --

20  need to be addressed by the school system in order for

21  that child to attain his or her own optimal level of

22  educational and academic development.

23  Q.   Did the records demonstrate that Mr. Konigsmark

24  demonstrated (sic) in the 504 program throughout his time

25  in the Cedar Rapids School District?

1   A.   What the records indicated was that in 2011

2   Mr. Konigsmark or at that point entering the high school

3   year chose to self-discharge himself out of the 504 plan.

4   Q.   And approximately 2011, did that coincide with

5   another significant event in Mr. Konigsmark's life?

6   A.   Yes, it did.

7   Q.   What was that?

8   A.   That was the year that his grandmother died.

9   Q.   And did Mr. Konigsmark report whether his

10  grandmother was his primary caregiver?

11  A.   Yes, he did.

12  Q.   Your review of the school records, do they reveal

13  whether Cedar Rapids School District attempted to contact

14  Tyler's mother about Tyler's decision on his own to

15  withdraw from the 504 program?

16  A.   All I saw in the records -- and there may be

17  something else that was not given to me.  But all I saw

18  in the records was a sticky note which basically stated

19  that Tyler as a child going from the eighth to the ninth

20  grade was choosing to discharge himself from the 504

21  plan.

22  Q.   Okay.  Moving forward to Mr. Konigsmark's

23  imprisonment, do you have an opinion as to whether

24  Mr. Konigsmark will be vulnerable with respect to other

25  inmates?

```
 1   A.    Yes, I do.

 2   Q.    What is that?

 3   A.    My opinion and, candidly, my fear is that he is

 4   going to be very vulnerable.

 5   Q.    Why is that?

 6   A.    As I mentioned before, Tyler is a person of low

 7   intellectual functioning.  What's also true is that he is

 8   a person who never had any contact with his biological

 9   father and, in addition, is somebody who interacted with

10   his mother's long-term boyfriend who he found to be

11   irrational and at times abusive.  He is a person who has

12   low self-esteem, is very eager to please, and would be

13   very easy to manipulate.

14   Q.    Doctor, is there anything that I forgot to ask you?

15   A.    Not that I can think of.

16         MR. NATHAN:  Nothing further, Your Honor.

17         THE COURT:  Thank you.

18   Mr. Tremmel, you may cross-examine.

19                   CROSS-EXAMINATION

20   BY MR. TREMMEL:

21   Q.    Morning, doctor.

22   A.    Good morning, sir.

23   Q.    Now, just to clarify, you are not a member of the

24   American Board of Professional Psychology or the ABPP?

25   A.    That would be correct.
```

*Contact Shelly Semmler at 712-233-3840 or shelly_semmler@iand.uscourts.gov*
*Reported with computer-aided transcription*
Case 1:16-cr-00057-CJW-MAR Document 84 Filed 08/20/20 Page 24 of 71

1  Q.   You have a diplomate from the American Board of

2  Psychological Specialties?

3  A.   That's correct.

4  Q.   But you are not board certified in clinical

5  neuropsychology.

6  A.   Correct.

7  Q.   Now, I'm trying to determine what actual paper

8  materials you looked at when you made your evaluation in

9  this case, and on page 2 of your report you state,

10  "Review of legal indictment and review of hospital

11  records."

12       First of all, on the legal indictment, was that just

13  the indictment, or was there any other paperwork related

14  to this case such as police reports or other documents

15  that you reviewed?

16  A.   Just the indictment.

17  Q.   And then the hospital records were from when?

18  A.   They were from UnityPoint Health in Cedar Rapids

19  from an emergency room visit from 9-23-14 as well as

20  medical records from after when Mr. Konigsmark was

21  arrested from 5-13-16 -- or May 13 of 2016 to May 16,

22  2016.

23  Q.   So other than the emergency room visit in 2014, the

24  other records were all after this investigation began?

25  A.   Correct.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Reported with computer-aided transcription*
Case 1:16-cr-00057-CJW-MAR   Document 94   Filed 08/20/20   Page 25 of 71

Q.   Any other records that you reviewed other than the
indictment and the medical records before you did your
examination of the defendant?

A.   No.

Q.   Any other records you reviewed other -- after your
examination other than the school records that Mr. Nathan
referred to?

A.   No.

Q.   Did you interview anyone other than the defendant?

A.   No.

Q.   On page 1 of your report in the bottom paragraph,
the top sentence of that paragraph says, "Tyler
Konigsmark reportedly has a history of mental illness."
It says, "Reportedly."  What's your source for that
information?

A.   My report was twofold.  Number one, a conversation,
very brief conversation, with his attorney and, secondly
and more importantly, the medical records from UnityPoint
Health which talked about him having anxiety issues, was
diagnosed with anxiety, and was given medication for
that.

Q.   So the mental illness is anxiety.

A.   That's correct.  If I could further say that in my
conversation with his attorney, his attorney told me --
and this is where the reportedly part would have come on

     1   in -- that he believed that Tyler had a prior diagnosis

     2   of ADHD.  Obviously I didn't have that information until

     3   I was able to look at the school records after the

     4   evaluation.

     5   Q.   I'd like to talk about the school records a little

     6   bit because there was a reference -- and this would be to

     7   when the defendant was in fourth grade about his

     8   performing at the first-grade level.  Is that from the

     9   intensive instruction plan?

    10   A.   That would be correct.

    11   Q.   And that says actually that his -- he was at a

    12   first-grade level on the BRI and DIBELS Oral Reading

    13   Fluency; correct?

    14   A.   Well, what it -- yes, it does.  What it states is it

    15   really is looking at an overall current level of

    16   performance, and that talked about the first-grade level.

    17   Q.   First-grade level in reading, and then it says fifth

    18   percentile per AEA norms; correct?

    19   A.   Correct.

    20   Q.   But his expected level of performance -- so it's a

    21   three-grade-level difference on reading.  That doesn't go

    22   to any other aspect of his intellectual functioning.

    23   A.   Correct.

    24   Q.   Now, if we go to the age 6, there was mention of him

    25   being in -- and I apologize if I misstate the numbers

1  here.  I believe the scores of 5, 2, and 1 were

2  mentioned.  This would be on the second page of the Grant

3  Wood AEA report from age 6.

4  A.    I'm sorry, sir.  Could you please show me where

5  you're talking about?

6  Q.    On the Grant Wood Area Educational Agency learning

7  development --

8  A.    Right, I'm on page 2.

9  Q.    Page -- the second page where it says test of early

10 reading ability?

11 A.    Uh-huh.

12 Q.    In that paragraph I see scaled scores of 5, 2, and

13 1, and I assume when Mr. Nathan was asking you about

14 numbers that's where those numbers were from?

15 A.    Yes.

16 Q.    So those lower scores are all, again, tests of

17 reading ability.

18 A.    Yes.

19 Q.    And actually in the top paragraph on that page, he

20 had a 32nd percentile in writing.

21 A.    Yes.

22 Q.    And then in the third paragraph on that page, he had

23 a 24 percentile in math.

24 A.    Yes.

25 Q.    And at the very end of that document on page 3, it

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Reported in Shorthand Using Computer-Aided Transcription
Case 1:16-cr-00057-CJW-MAR   Document 94   Filed 08/20/20   Page 28 of 71

1  says Tyler's mother may wish to pursue a medical

2  evaluation at her own expense to rule out attention

3  deficit with hyperactivity disorder; is that correct?

4  A.    Yes.

5  Q.    Okay.  Is there anything in the school records that

6  you found about his having an intellectual disability?

7  A.    What I have -- and I don't have it right in my

8  fingertips, though.  If you give me a moment, I can --

9  was the IQ scores from the WISC-III, but that would be --

10 again, we're talking about after the fact, not -- not

11 before I wrote my report.

12 Q.    And these would be at what age?

13 A.    This would have been at age 6.  He doesn't have a

14 score per se, but it showed that he was not able to

15 perform on the WISC-III.

16 Q.    Because he frequently responded, "I don't know"?

17 A.    Correct.

18 Q.    And he often gave up when he perceived an item as

19 too difficult.

20 A.    It stated that he had a low frustration tolerance.

21 Q.    And that would be consistent with ADHD?

22 A.    Correct.

23 Q.    But nothing in here about borderline intellectual

24 functioning.

25 A.    It would be -- given the fact that they could not

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Reported with computer-aided transcription*
Case 1:16-cr-00057-CJW-MAR   Document 84   Filed 08/20/20   Page 29 of 71

```
1    actually come up with the -- they couldn't come up with a
2    valid WISC-III, it would be -- you couldn't give a
3    diagnosis of borderline intellectual functioning because
4    he wasn't able to take the test.
5    Q.    Is there anything else in the school district
6    reports that supports -- or that states he is borderline
7    intellectual functioning or having an intellectual
8    disability other than his failure to complete those items
9    on the WISC-III?
10   A.    When one looks at the -- not -- his inability to do
11   the items of the WISC-III at age 6, when one looks at his
12   reading scores, when one views his transcripts as well as
13   being placed on a 504 plan, when one looks at the fact
14   that he was recommended to be tethered to his desk, there
15   are certainly indications that he has both ADHD as well
16   as lower intellectual functioning.
17   Q.    But the 504 plan was to accommodate his difficulty
18   in focusing; right?
19   A.    Yes.
20   Q.    And difficulty in focusing is different from having
21   an intellectual disability.  Would you agree with that?
22   A.    They absolutely can go hand in hand, sir.  Over time
23   if you're not able to focus what's going on in school,
24   then you stop being able to learn at a decent clip.
25   Q.    So it says he has -- Tyler has -- in one of these he
```

 1   has difficulty completing quality assignments.  That

 2   could be because of ADHD; correct?

 3   A.   Yes.

 4   Q.   He did complete one semester of community college;

 5   is that right?

 6   A.   He did not -- no.  To my knowledge he actually was

 7   not able to complete it because of problem -- this would

 8   have been done in Louisiana; correct, sir?

 9   Q.   That's right.

10   A.   Yeah.  My understanding is that he completed some

11   classes but was not able to complete a remedial math

12   class and, therefore, lost his scholarship.  So I would

13   not call that a successful completion, sir.

14   Q.   Now, you state that -- on page 2 of your report --

15   and this would be in the second paragraph -- that he was

16   hospitalized in May and says this occurred after he was

17   accused as a 19-year-old male to have a sexual encounter

18   with a 15-year-old.

19   A.   Correct.

20   Q.   Is that from the medical records?

21   A.   That is from the medical records at UnityPoint, yes.

22   Q.   And what is the source of the age of the victim

23   being 15 years old?

24   A.   That would have been the medical records.

25   Q.   Okay.  And who would have -- where did that come

1  from?  Was that the defendant, Tyler Konigsmark, saying

2  she was --

3  A.   I would imagine that would come -- I would imagine

4  so, yes.

5  Q.   Also on page 2 -- excuse me.  On page 3 of your

6  report in the very bottom paragraph -- I'm looking at the

7  third sentence -- Tyler Konigsmark has reportedly had

8  sexual intercourse with four to five females all of which

9  have/had been at or around his chronological age.  Once

10  again, it has the word "reportedly" in there.  Where did

11  you get that information from?

12  A.   I got that information from Tyler Konigsmark.

13  Q.   During your interview?

14  A.   Yes.

15  Q.   So he told you all of the females he had sexual

16  intercourse with had been around his chronological age.

17  A.   Obviously we did discuss the crime that he, you

18  know, has admitted to, and that would not include that

19  group, but prior to -- prior to the events of the spring

20  of 2016, that's what he stated, yes.

21  Q.   And at the bottom sentence of that page it said, "He

22  said he has never been attracted to females that were

23  appreciably younger than him."

24  A.   Correct.

25  Q.   I assume "appreciably" is not his word.  Is that

*Contact Shelly Semmler at 712-233-3840 or shelly_semmler@iand.uscourts.gov*
*Reproduced from a FTR recording of proceedings*

Case 1:16-cr-00057-CJW-MAR   Document 64   Filed 08/20/20   Page 32 of 71

1  yours?

2  A.   That's my word, yes.

3  Q.   What did he say?

4  A.   I can't give -- he said -- I think I asked him have

5  you been -- are you or have you had an attraction to

6  females that were much younger than you, and he said no.

7  Q.   And did you accept that when he told you that?

8  A.   I didn't accept that as truth per se.  I looked

9  at -- once again, I was collecting information.  And

10  after I collect information, I then form opinions.  I

11  don't -- simply hearing the statement doesn't make it

12  true.

13  Q.   So after reviewing everything, do you believe that

14  he has never been attracted to females that were

15  appreciably younger than him?

16  A.   I believe that he is an individual who has a much

17  lower mental age as I stated before.

18  Q.   And that wasn't my question.

19  A.   Okay.

20  Q.   Do you believe that he has never been attracted to

21  females that were appreciably younger than him?

22  A.   No, I do not believe that.

23  Q.   On page 2 of your report in the bottom paragraph you

24  state, "Tyler admits that he had inappropriate contact

25  with a minor that involved both Snapchatting and

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Computer aided report. Filed 08/20/20 transcript.*
Case 1:16-cr-00057-CJW-MAR   Document 94   Filed 08/20/20   Page 33 of 71

1  exchanging explicit photos."

2  A.    Correct.

3  Q.    That does not state that he had sexual intercourse

4  with the minor, does it?

5  A.    No, it does not.

6  Q.    At any point during your interview with him did he

7  admit that he had sexual intercourse with a minor?

8  A.    Yes.

9  Q.    Where is that indicated in your report here?

10 A.    I did not include that in the report because it was

11 not part of the charges.  And when I write a report, I'm

12 not going to put in that report something which the

13 person is not at that point currently charged with.

14 Q.    Well, you put in there he had sexual intercourse

15 with four or five females around his chronological age.

16 He wasn't charged with that, was he?

17 A.    That had nothing to do with the charges, sir.

18 Q.    But you included that in your report.

19 A.    Yes.

20 Q.    But when you talked about what he admitted to doing,

21 all you have in your report that he admitted to doing was

22 Snapchatting and exchanging explicit photos and then that

23 it was a seventh grade student.

24 A.    Correct.

25 Q.    But when you talk -- on the bottom of page 2,

Contact Shelly Semmler at 712-233-3841 or shelly_semmler@iand.uscourts.gov
*Computer-aided transcription*
Case 1:16-cr-00057-CJW-MAR Document 84 Filed 08/20/20 Page 34 of 71

1   nowhere in there do you say he admitted to having sex

2   with a 12-year-old.  Did you have a conversation with him

3   again after your initial interview where he clarified

4   that he left some things out?

5   A.   No, no.  I think I was very clear.  He admitted --

6   what he stated was not that he had sexual intercourse.

7   Quite honestly what he stated was that he attempted to

8   have sexual intercourse but that it didn't work or he was

9   not able to have any kind of penetration with this

10   person.  That's what he stated to me.

11        Nonetheless, again, as a -- as a matter of course,

12   when a defendant is charged with a crime in terms of

13   writing up what the alleged event is or is not, if the

14   person in part of their conversation with me admits to

15   things that are not stated specifically in the

16   indictments, then I as a psychologist believe that I have

17   the responsibility to not state that he's admitting to

18   things which in my understanding with the charges he is

19   not being charged with at that point.

20   Q.   So just to clarify then, he told you that he was

21   unable to have penetration, so he actually didn't have

22   sexual intercourse with her or he attempted to but he was

23   not able to penetrate her?

24   A.   That is what I understand, yes.

25   Q.   That's what he --

1  A.   That's what he told me, correct.

2  Q.   I directed you to page 4 of your report, and this

3  would be the paragraph directly above the heading

4  Behavioral Observations.

5  A.   Correct.

6  Q.   You state in here that one final clinical note is

7  that Tyler Konigsmark reports to have unusual perceptual

8  experiences.  He said that, quote, I see ghosts in a way.

9  I see figures if I concentrate real hard.  And then he

10  goes on about a cable TV show.

11  A.   Correct.

12  Q.   Is there -- are there any other records other than

13  his telling you that he saw ghosts?

14  A.   No.

15  Q.   The first report of that that you can see from your

16  review of the materials is in his interview with you.

17  A.   Yes.

18  Q.   So is it your opinion that he saw ghosts?

19  A.   It's my opinion that he does not have a delusional

20  disorder or psychosis.  I didn't take that information in

21  there to form a diagnostic -- a positive diagnostic

22  opinion from it.

23  Q.   Well, let me direct you to page 8 of your report on

24  the very bottom paragraph.  The very last sentence, he

25  clearly has bizarre sensory experiences that affected his

*Contact Shelly Semmler at 712-233-3840 or shelly_semmler@iand.uscourts.gov*
*Official Court Reporter Using Computerized Transcription*
Case 1:16-cr-00057-CJW-MAR   Document 64   Filed 08/20/20   Page 36 of 71

```
 1    ability to make good decisions, but these do not reach
 2    the level of a delusional disorder.
 3    A.    Correct.  That was not based on that statement.
 4    That was based on the MMPI-2.
 5    Q.    So that wasn't based on his statement about ghosts,
 6    that he had bizarre sensory experiences?
 7    A.    The statement about ghosts offers some sort of
 8    corroboration, but the statement in terms of the bizarre
 9    sensory experiences came from his elevation on 8 on the
10    MMPI-2 as well as his elevations on the reconstructed
11    scales, on the RC8 which is aberrant experiences.
12          And in addition, on the Psy-5 scales from the
13    MMPI-2, he scored a T score on the psychotic score of 91.
14          And again, sir, to be very clear, I am not
15    diagnosing Tyler Konigsmark with a -- with having
16    schizophrenia.  I'm not diagnosing him with having a
17    delusional disorder.  I'm simply stating that he -- there
18    is some indications that these are issues for him.
19    People can have subclinical issues, and I think that that
20    would be the case in his part.  But it doesn't reach the
21    level of a diagnosis.
22    Q.    On page 7 -- and I would go to the second paragraph
23    from the bottom --
24    A.    Is that the page beforehand, sir?
25    Q.    Yes -- there's a sentence beginning, "In addition,
```

*Contact Shelly Semmler at 712-233-3840 or shelly_semmler@iand.uscourts.gov*
*Reported in complete ... digital transcript*

Case 1:16-cr-00057-CJW-MAR   Document 84   Filed 08/20/20   Page 37 of 71

1  Tyler Konigsmark is suffering from serious feelings of

2  persecution and feelings that he is losing his ability to

3  master his focus and concentration."

4  A.   Correct.

5  Q.   Explain to me what he said about being persecuted.

6  A.   Once again, those are sta -- that is a statement

7  that is not coming from his -- what he told me, but that

8  is an interpretation of the -- from the MMPI-2.

9          MR. TREMMEL:  Thank you.  That's all the

10  questions I have.

11          THE COURT:  Thank you, Mr. Tremmel.

12      Mr. Nathan, any redirect?

13          MR. NATHAN:  Yes, Your Honor.

14                  REDIRECT EXAMINATION

15  BY MR. NATHAN:

16  Q.   The prosecutor asked you some questions about the

17  tests when Tyler was in fourth grade?

18  A.   Yes.

19  Q.   And he talked to you about reading levels versus

20  writing levels and things like that.  In your opinion is

21  reading ability a pretty good proxy for intellectual

22  ability?

23  A.   At early ages, yes, it is.

24  Q.   They also asked you about the 504 program and the

25  basis for that or what might not be the basis for that.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Reproduced without permission is prohibited*
Case 1:16-cr-00057-CJW-MAR   Document 94   Filed 08/20/20   Page 38 of 71

1    But in your review of the records, one of the bases for

2    the 504 program was achievement tests; correct?

3    A.    Correct.

4    Q.    Another basis was classroom performance data;

5    correct?

6    A.    Correct.

7                 MR. NATHAN:  Nothing else.

8                 THE COURT:  Any recross, Mr. Tremmel?

9                 MR. TREMMEL:  No, Your Honor.

10                THE COURT:  Doctor, I just have a few questions

11   for you.

12                THE WITNESS:  Of course, Your Honor.

13                THE COURT:  Am I reading your report correctly

14   on page 6 that his full scale Wechsler IQ places him in

15   the bottom 2 percent?

16                THE WITNESS:  That would be correct, Your

17   Honor.

18                THE COURT:  Okay.  And just a friendly tip.  If

19   you'd put page numbers on your report like you did on

20   your CV, it would be helpful.

21                THE WITNESS:  You know, Your Honor, I thought I

22   had.  I apologize.

23                THE COURT:  Yeah.  No problem.  I went back and

24   put page numbers on it so I could refer to them.

25        So I want to jump ahead to page 10 which is your

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Reporter's Official Transcript*
Case 1:16-cr-00057-CJW-MAR  Document 94  Filed 08/20/20  Page 39 of 71

1  conclusion section.

2          THE WITNESS:  Yes, Your Honor.

3          THE COURT:  And I'm focusing on the middle

4  paragraph there.

5          THE WITNESS:  Right.

6          THE COURT:  About his poor judgment, lack of

7  impulse control, perpetual low self-esteem.

8          THE WITNESS:  Right.

9          THE COURT:  How do you think those

10 characteristics affected his commission of the crime

11 here?

12          THE WITNESS:  Well, I think that they were --

13 first of all, it's a great question, Your Honor, and I

14 think that they were absolutely key to it.  You know,

15 unfortunately I think in my opinion for Tyler

16 Konigsmark -- and once again, I am in no way, shape, or

17 form attempting to justify this behavior.

18          THE COURT:  No, I understand that.

19          THE WITNESS:  Okay.

20          THE COURT:  Yeah.

21          THE WITNESS:  But I think for him, it really

22 was a perfect storm, and I think it was a perfect storm

23 unfortunately of the prior issues, the lower intellectual

24 functioning, the -- you know, it's not simply having ADHD

25 because a lot of people have ADHD and they don't do these

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Reproduced Electronically from Transcript
Case 1:16-cr-00057-CJW-MAR  Document 94  Filed 08/20/20  Page 40 of 71

```
 1   things.  The ADHD sets the table, and then you come back
 2   from also not having the guidance and structure in which
 3   you can behave with these problems, you know, coming from
 4   a failure experience in which he was ashamed from in
 5   Louisiana and then just kind of latching on to a job
 6   because that was the job that was offered to him.  When
 7   the job was offered to him, in my opinion Tyler ends up
 8   taking the job, ends up in -- you know, feeling good
 9   about the interactions he's having on the bus, does not
10   have the sense to understand -- he understands that
11   they're illegal, but he doesn't have the emotional sense
12   to understand how inappropriate and awful this is.
13           THE COURT:  And I wanted to ask you -- you cite
14   to the National Institute of Mental Health report about
15   the teen brain under construction.  I know you have --
16   you're involved in some neuropsychological organizations.
17           THE WITNESS:  Yeah.
18           THE COURT:  And I've studied this area fairly
19   extensively myself.  But I just wanted to see if you
20   could explain that his lack of impulse control, isn't
21   that fairly typical for 19-year-old males?
22           THE WITNESS:  It is typical of a 19-year-old
23   male.  You know, what we're really talking about -- and
24   I'm sure Your Honor knows -- is really the development of
25   the prefrontal cortex.
```

Contact Shelly Semmler at 712-233-3841 or shelly_semmler@iand.uscourts.gov
Reporter's Certified Transcript
Case 1:16-cr-00057-CJW-MAR   Document 84   Filed 08/20/20   Page 41 of 71

```
 1            THE COURT:  Right.  That's what I was going to
 2   ask you about.
 3            THE WITNESS:  And so that's what we're talking
 4   about.  It's going to be further diminished in a person
 5   with ADHD because individuals with ADHD are going to
 6   struggle with prefrontal cortex types of behaviors such
 7   as being able to plan and being able to kind of
 8   execute -- you know, involve and execute -- execute --
 9   executive functioning -- excuse me.  I was stumbling on
10   that word -- and then as well as really develop impulses
11   or stops in one's behavior.  The prefrontal cortex is not
12   simply engaged in the execution of behavior but also in
13   the inhibition of behavior.
14            THE COURT:  And one of the reasons why
15   neuropsychologists and neuropsychiatrists know that is
16   because of the advent of functional MRI tests and brain
17   imaging.
18            THE WITNESS:  Exactly.
19            THE COURT:  And they can tell how well
20   developed the prefrontal cortex is, and it's really
21   undisputed among neuropsychologists that young people do
22   not have a fully developed prefrontal cortex and that's
23   the scientific explanation or the neurological
24   explanation for the lack of impulse control.
25            THE WITNESS:  Absolutely.  Simply when you look
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Appeal court reporter transcript.*
Case 1:16-cr-00057-CJW-MAR   Document 64   Filed 08/20/20   Page 42 of 71

```
 1   at the FMRIs, when you look at the PET scans, you can
 2   just see where hot spots are and where hot spots aren't.
 3            THE COURT:  Okay.  Those are all the questions
 4   I have.  I'm going to turn it back over to the lawyers
 5   because I always give them an opportunity for any
 6   follow-up questions.  Any follow-up questions by the
 7   lawyers?
 8            MR. NATHAN:  No, Your Honor.  Thank you.
 9            MR. TREMMEL:  No, Your Honor.
10            THE COURT:  Doctor, I just wanted to thank you
11   for your comprehensive report.  It was very helpful to me
12   in trying to arrive at a fair sentencing in this case.
13   So I appreciate it very much.
14            THE WITNESS:  I really appreciate that.  Thank
15   you, Your Honor.
16            THE COURT:  Okay.  Thanks.  And I was just
17   having some fun with you about "doctor."
18            THE WITNESS:  No, I -- it was taken as such.
19            THE COURT:  Ninety percent of doctors when I
20   ask them their name, you know, they say "doctor" which is
21   amusing to me because it's a title, but I was just having
22   some fun with you.  Serious matter, but we can have some
23   levity too.
24            THE WITNESS:  Well done.
25            THE COURT:  Thank you.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Reporter's Certificate/Transcript*
Case 1:16-cr-00057-CJW-MAR   Document 64   Filed 08/20/20   Page 43 of 71

```
 1              Is there any additional evidence from the defense?

 2                   MR. NATHAN:  No, Your Honor.  Thank you.

 3                   THE COURT:  Okay.  So we're really going to be

 4      arguing now about a downward variance.  And here are the

 5      parameters that I understand.  The government has

 6      recognized that a downward variance from a life sentence

 7      is appropriate in this case but has suggested a floor of

 8      15 years or 180 months, and the defense has suggested a

 9      downward variance is appropriate in this case and has

10      suggested a range of 151 to 188 months.  Is that accurate

11      in terms of what the parties are recommending?

12                   MR. TREMMEL:  Yes, Your Honor.

13                   THE COURT:  Okay.

14                   MR. NATHAN:  Yes, Your Honor.

15                   THE COURT:  Okay.  It's your motion for a

16      downward variance, so, Mr. Nathan, we'll hear from you

17      first.

18                   MR. NATHAN:  Thank you, Your Honor.  When the

19      defense arrived at its recommended range, it did so

20      keeping in mind that Congress has established the

21      mandatory minimum of 10 years.  And then the defense

22      imagined the most innocent kind of case that would

23      justify the mandatory minimum.

24              And the defense recognizes some of the points made

25      by the prosecutor that based on number of victims, based
```

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Appeal from an opinion of the court transcript

Case 1:16-cr-00057-CJW-MAR  Document 94  Filed 08/20/20  Page 44 of 71

 1    on the incidents of sexual intercourse, more than once,

 2    and based on the ages of the victims, that this is not

 3    the ten-year case.

 4          And then the defense went down the guidelines in

 5    criminal history category 1, and it's hard to draw a

 6    distinction between 151 months and something 10 months

 7    lesser or greater.  But in the defense's opinion, that is

 8    the appropriate range between which Your Honor should

 9    sentence Mr. Konigsmark.

10          And the defense actually, so it's clear, arrived at

11    that range before it had the opportunity to fully examine

12    the Jacob case, and then the defense obviously recognized

13    that in the Jacob case Your Honor arrived at a similar

14    range.

15          And in comparing the two, there are similarities

16    that justify the similar range and, in fact, the exact

17    same sentence such as neither Mr. Jacob nor

18    Mr. Konigsmark had any criminal history.  Both

19    Mr. Konigsmark and Mr. Jacob had substantial support

20    demonstrated today not only by Exhibit E, the letters,

21    but by the presence of family and friends in court.

22                THE COURT:  Well, that's hard for me to gauge

23    because it could be friends and relatives of the victims.

24    So I have no idea who's supporting who here, nor does the

25    sheer number of people in the courtroom -- you know, it's

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Reproduced from electronic filing/transcript*
Case 1:16-cr-00057-CJW-MAR   Document 94   Filed 08/20/20   Page 45 of 71

```
1   not a -- it's not a which way the wind is blowing type
2   public opinion poll to determine what a sentence should
3   be.  But I have no way of knowing who's supporting who,
4   and there are two sides to this case.
5         MR. NATHAN:  Of course, Your Honor.  And then
6   the defense would simply rely on Exhibit E.  The letters
7   in support --
8         THE COURT:  Yes, and I read those very
9   carefully.
10        MR. NATHAN:  -- were extremely well written and
11  not only indicated in their opinion what sort of person
12  that Tyler is but also the difficult childhood that he
13  went through which I'll just segue slightly that one of
14  the differences between Mr. Konigsmark and the defendant
15  in Jacob is that respectfully and cautiously the defense
16  argues that Mr. Konigsmark had a more difficult childhood
17  than the defendant in Jacob.
18     Mr. Konigsmark reported both to probation and to
19  Dr. Konar that his father has been absent from his life
20  from a small child until just recently and that he
21  suffered both physical and mental abuse at the hands of
22  his mother's boyfriend.
23     One of the similarities between Mr. Jacob and
24  Mr. Konigsmark is the clear and unequivocal sense of
25  shame that they felt.  There was a stipulation that on
```

*Contact Shelly Semmler at 712-233-3840 or shelly_semmler@iand.uscourts.gov*
*Appeal from official court reporter's transcript*

Case 1:16-cr-00057-CJW-MAR   Document 64   Filed 08/20/20   Page 46 of 71

1  May 16 that Mr. Konigsmark asked to apologize to A.P.

2  And Mr. Konigsmark had suicidal thoughts and was

3  hospitalized, and the reasonable inference from that is

4  he knew he'd done something wrong.  He knew that he was

5  going to go to prison but not just that because plenty of

6  defendants know they're going to do something wrong and

7  know they're going to prison and they figure to

8  themselves, I think, that they're going to get out one

9  day and move on with their lives.

10      The difference here is that Mr. Konigsmark knew that

11  if and when he got out of prison his life would never be

12  the same.  He'd be a sex offender.  His family and

13  friends would look at him differently.  And that's

14  another similarity between this defendant and the

15  defendant in Jacob.

16      And I would, based on the testimony of Dr. Konar,

17  cite, again, the Jacob case and its -- what I'll simply

18  call at page 1118 where Your Honor concluded that the

19  record demonstrated that Jacob's conduct was a result to

20  a substantial extent of immaturity, lack of judgment, and

21  social isolation and that his interest in a girl 8 or 10

22  years his junior, while far from acceptable, was not as

23  bizarre in an immature male in his early 20s or

24  necessarily indicative of deep-seated pedophilia or

25  predatory sexual conduct as such conduct might be for a

person one could reasonably expect to have more mature
judgment and social experience.

First, in Jacob who was evaluated by an expert, the
expert did not diagnose Jacob with any sort of borderline
intellectual disorders. Here we asked Your Honor to
accept the report and Dr. Konar's testimony that not only
based on the examinations administered by Dr. Konar but
also on the school records that Mr. Konigsmark does
suffer from borderline intellectual disorders that
further mitigate his behavior based on the studies we've
cited in our memo and the studies with which Your Honor
is obviously familiar.

And the defense -- and again, it's difficult to sort
of distinguish between 19-year-olds and 20-year-olds and
22-year-olds, 23-year-olds. But the defendant in Jacob
was 23, whereas Mr. Konigsmark here was 19 years old. So
those are some of the similarities and, of course,
dissimilarities that militate in favor of the advisory
range of 151 to 188 months.

And while the defense has acknowledged the
aggravating factors that are present in this case that
elevate it above the mandatory minimum, by way of
comparison again because it's hard to not compare 2 cases
where defendants were convicted under 2422(b) and both
cases involved a 12-, a 13-, or 14-year-old or, in Jacob,

 1  I know a fictional but fictional 13-year-old or

 2  15-year-old and I know that in this case there was actual

 3  sexual intercourse on two occasions.  But in Jacob as

 4  Your Honor found, that defendant traveled from Minnesota

 5  to Black Hawk County for the purpose of engaging in

 6  sexual intercourse.

 7       And I don't know how mitigating it is for that

 8  defendant that but for the fictitious nature of the

 9  15-year-old that he did not actually engage.

10       But one of the aggravating factors in Jacob, again,

11  by way of comparison that's not present here, is that the

12  defendant in Jacob was in possession of a digital camera.

13  He intended to record his sexual encounter with that

14  15-year-old girl.

15       That did not happen here, and that was part of the

16  thrust of our sentencing memo that what's really, in the

17  defense's opinion, occurring here and being punished here

18  is a sexual abuse in the third degree.  And that's why we

19  presented Your Honor with Exhibits -- excuse me -- A and

20  B because A, of course, is a comprehensive survey of

21  every state and the District of Columbia.  But Exhibit B

22  is also the expected time that a defendant convicted of

23  sex crimes in Iowa will actually serve.  And that can

24  inform Your Honor's decision.

25       And I can go on and on about the differences between

this defendant and other defendants, and the defendant --

sorry, the defense is always hesitant to mitigate by way

of the offense could have been worse.

THE COURT:  Well, what's your basis for that

that can or should inform my decision?  I thought the

Eighth Circuit had ruled that we're not supposed to look

at equivalent state court punishment.  That's my

recollection.  And you know why it's my recollection?

Because I did, and they said I shouldn't have.

But I think there's another way to look at it.  The

sentencing commission when it was formed by the

Sentencing Reform Act of 1984 -- I don't remember the

precise section, but the sentencing commission was

charged with seeking community input with regard to what

the guidelines ought to look at.  Of course, it's

something the sentencing commission has never, ever done,

and I've criticized them in a couple law review articles

for not doing that.

So it seems to me that your exhibits can be

considered in that light about these are community

standards reflected by all 50 states, and the sentencing

commission hasn't taken that into consideration so in

terms of any policy disagreement I might have with the

way the guidelines work out here to create what I think

is a ludicrous sentence of life imprisonment.  I mean,

Contact Shelly Semmler at 712-233-3840 or shelly_semmler@iand.uscourts.gov
Reporter's Certified Transcript
Case 1:16-cr-00057-CJW-MAR   Document 84   Filed 08/20/20   Page 50 of 71

```
1   people commit first-degree murder and, as you pointed out

2   in your brief, you know, people commit murder by

3   skyjacking an airplane and killing people and they get

4   the same sentence.  So, you know, not that what he did

5   isn't super serious.  It is.  Nobody's trying to minimize

6   that.  But it's pretty ridiculous to lump first-degree

7   murderers and people who highjack airplanes and kill

8   people with this individual.

9              MR. NATHAN:  Yes, Your Honor.  And the defense

10  would echo the argument from the sentencing memo which is

11  what Your Honor just stated.

12             THE COURT:  Anything else you want to add?

13             MR. NATHAN:  No, Your Honor.  Thank you.

14             THE COURT:  Okay.  Mr. Tremmel?  Parties aren't

15  really all that far apart in terms of proposed sentences.

16             MR. TREMMEL:  Your Honor, we agree that a

17  variance below a life sentence would be appropriate.

18  This is, you know, as the parties acknowledge a serious

19  offense against younger girls.  The defendant is a

20  20-year-old man with no prior criminal history.  And he

21  did have family difficulties.  He was 19, and he had

22  ADHD.

23      Dr. Konar is the only person who is suggesting that

24  there's a potential borderline intellectual functioning.

25  I don't see that supported by the records and by the
```

```
 1    school records.  Dr. Konar also said that the defendant
 2    had impulse control problems.  We don't find that
 3    mitigating if the impulse control problem causes you to
 4    have sex with a 12-year-old.  He attempted to get
 5    sexually explicit pictures from 3 separate younger girls,
 6    and from the 12-year-old he did receive vaginal pictures
 7    and had unprotected intercourse with her twice.
 8        And what we would see as an aggravating factor in
 9    this case is that the defendant was employed as a school
10    bus attendant and took advantage of that position to meet
11    the girls he exploited or attempted to exploit.
12            THE COURT:  But that's already taken into
13    account in the guideline calculation.
14            MR. TREMMEL:  Absolutely.
15            THE COURT:  Yeah, it's not a 3553(a)
16    aggravating factor because it's already included in the
17    guidelines.
18            MR. TREMMEL:  To the extent, Your Honor, that
19    the Court disagrees with the guidelines, though, I think
20    fact -- I think facts that are aggravating --
21            THE COURT:  I don't disagree with that
22    guideline.  I don't disagree with the enhancement that he
23    received for -- that his position on the bus allowed
24    him -- you know, facilitated the commission of the crime.
25    I think that's a perfectly permissible guideline
```

Case 1:16-cr-00057-CJW-MAR   Document 64   Filed 08/20/20   Page 52 of 71

```
 1   enhancement that makes a lot of sense, unlike many of the
 2   others that don't, but that's not one I disagree with.
 3           MR. TREMMEL:  All right.  Well, Your Honor,
 4   based on all the factors, both aggravating and
 5   mitigating, we believe that while a variance is
 6   appropriate that the Court should impose a sentence of at
 7   least 15 years' imprisonment.  Thank you.
 8           THE COURT:  Thank you, Mr. Tremmel.  I just
 9   want to see if I have some more questions for you.  Oh,
10   yeah.  I'm interested in your comment about you don't see
11   the borderline intellectual functioning.  So are you
12   saying that the score isn't very reliable that Dr. Konar
13   gave on the Wechsler -- his full-scale IQ score isn't?
14   But somebody -- because somebody in the lower 2 percent
15   would certainly be borderline functioning.
16           MR. TREMMEL:  Your Honor, the only person who's
17   found this is Dr. Konar, and Dr. Konar obviously was
18   retained by the defense and is not certified with the
19   ABPP, and he is basing his conclusions in the rest of his
20   report on interviews with the defendant where the
21   defendant made statements that are inconsistent with what
22   the record shows.
23       So I don't think that Dr. Konar's evaluation alone
24   is persuasive authority to say that the defendant has an
25   intellectual disability or certainly that any
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Appeal via electronic filing from U.S. District Court*

Case 1:16-cr-00057-CJW-MAR Document 94 Filed 08/20/20 Page 53 of 71

1  intellectual disability he has would be a significant

2  mitigating factor in this case, particularly if he's

3  claiming that impulse control arising out of that is what

4  caused him to have sex with a 12-year-old.

5        THE COURT:  I don't think he's saying it's what

6  caused it.  He's saying it's a contributing factor.

7  There's a difference.

8      So let me understand this.  What is it about

9  Dr. Konar's administration of the Wechsler IQ test and

10  the results that you disagree with?  Did he administer

11  the test improperly?  Was it improperly scored?  Is the

12  test not an accurate measure of full-scale IQ?

13        MR. TREMMEL:  Given the limited information

14  that we have from Dr. Konar's report, it's difficult to

15  tell, you know, what the basis -- what the underlying

16  figures are that lead to those numbers.

17        THE COURT:  Well, where's your test?

18        MR. TREMMEL:  Your Honor, we don't have a test.

19        THE COURT:  Well, you could have done a test.

20  You could have hired an expert.  If you disagreed with

21  the Wechsler test, you could have hired an expert and had

22  your own test given.  So it's a little bit, I think,

23  bizarre for you to stand there as a representative of the

24  executive branch of government and say I ought to

25  disregard a well-established, recognized test because the

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Aspen Court Reporting & Transcription*
Case 1:16-cr-00057-CJW-MAR   Document 94   Filed 08/20/20   Page 54 of 71

defense hired the person and not present other evidence
to contradict it if you think it was an inaccurate test.
I'm not going to invalidate a standard recognized test
unless you can show there's a reason that I shouldn't
consider it.

But you haven't shown that it was improperly
administered, that it was improperly scored, that it's
not a generally recognized test of relevant IQ.  And you
didn't take advantage of your opportunity to give your
own independent test by who -- a psychologist or
psychiatrist or whoever you chose and put that evidence
in the record.

MR. TREMMEL:  Your Honor, we did not even know
there was an allegation that the defendant had borderline
intellectual disability until we received the exhibit
from the defendant that stated that.  And so the Court is
correct that it can consider Dr. Konar's report and his
testimony for whatever weight it deems appropriate.  It
appears, you know, likely that the Court is going to give
his report and testimony greater weight than the
government gives it.  That's a point of disagreement.

THE COURT:  Well, that may or may not be the
case.  But I'm not talking about his entire testimony or
his entire report.  I'm talking about an objective
recognized -- the singular most recognized IQ test, and

Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov
Appeal case reporter / Digital transcript
Case 1:16-cr-00057-CJW-MAR   Document 94   Filed 08/20/20   Page 55 of 71

```
 1   you can't point to anything in it in the way it was
 2   administered or the test scores that I should discount.
 3   You should just say, well, discount it because it was the
 4   defendant's expert.  But the answer to that is where's
 5   yours, and there isn't any.
 6        So I think it would be completely unfair to discount
 7   that test score simply because you say I ought to
 8   discount it because you don't have a single objective
 9   reason why I should discount it.  What's your objective
10   reason?
11             MR. TREMMEL:  Your Honor, the objective reason
12   is the rest of the reports show that Dr. Konar is taking
13   Mr. Konigsmark at his word.  He doesn't even put in his
14   report the admission that he -- now it's that he
15   attempted to have sexual intercourse with a 12-year-old.
16             THE COURT:  And what does that have to do with
17   an IQ test?
18             MR. TREMMEL:  I think when the entire report is
19   based on going just with what the defendant tells you and
20   that's it, that that reflects upon all the work that he
21   did.
22             THE COURT:  Well, I suspect that, you know, the
23   only way to do an IQ test of this individual is to have
24   this individual take it, not to have somebody else take
25   it for him.
```

1    So I just don't -- the fact that you can pick at a

2 couple of points in the report and say, well, there's

3 another way of looking at it which I agree with --

4 there's multiple ways of looking at it -- doesn't

5 invalidate an objective, psychological well-recognized

6 test, particularly when you had the opportunity to do

7 your own test.

8    So I'm not going to discount that test.  I'm willing

9 to discount some other things in the report but not an

10 objective test because there's no reason to.  And I think

11 your reasons that you offered are ridiculous.  I don't

12 give -- I give zero weight to any of your reasons on why

13 I should discount the Wechsler test because I don't think

14 you have -- they're not even in the ballpark of being

15 reasonable.  They're so patently unreasonable and

16 ridiculous that I can't imagine anybody discounting this

17 test for those reasons except you --

18         MR. TREMMEL:  I understand, Your Honor.

19         THE COURT:  -- okay?  But I'm willing to take

20 all day for you to give me any more objective reasons

21 about why I ought to discount it.

22         MR. TREMMEL:  Your Honor, all I have is the

23 limited information of a half a page chart that we have

24 here, and so I don't have anything more on the basis for

25 how he got the results on that chart.

```
 1              THE COURT:  You could have requested the
 2    underlying tests and had that data analyzed if you wanted
 3    to.
 4              MR. TREMMEL:  Your Honor, we got this report
 5    recently.  This is all the data that --
 6              THE COURT:  When did you get the report?
 7              MR. TREMMEL:  Well, it's file stamped the 29th,
 8    Your Honor.  I would have to look at -- I don't have
 9    my --
10              THE COURT:  29th of what month?
11              MR. TREMMEL:  Of this month.  I don't
12    have the -- I don't have --
13              THE COURT:  It wouldn't be this month.  We
14    haven't hit the 29th yet.
15              MR. TREMMEL:  I'm sorry.  Of November.
16              THE COURT:  Okay.  You could have asked for a
17    continuance.
18              MR. TREMMEL:  I don't -- I don't have my e-mail
19    records to what day they were --
20              THE COURT:  Okay.  But, you know, had you
21    wanted to contest the -- an expert opinion, I would have
22    granted a continuance, particularly if you didn't get the
23    report until last week.  But anything else?
24              MR. TREMMEL:  No, Your Honor.
25              THE COURT:  Mr. Nathan, anything else?
```

*Contact Shelly Semmler at 712-233-3840 or shelly_semmler@iand.uscourts.gov*
*Reproduced electronically by U.S. District Court, NDIA*

Case 1:16-cr-00057-CJW-MAR   Document 64   Filed 08/20/20   Page 58 of 71

1          MR. NATHAN:  No, Your Honor.

2          THE COURT:  So, Mr. Tremmel, are you -- let's

3    ask about this other part.  I'll tell you what I thought

4    was the most significant part of the report, and that's

5    on page 10, and it was the paragraph under conclusions,

6    the middle paragraph.  Tyler Konigsmark's poor judgment,

7    lack of impulse control, perpetual lower self-esteem, and

8    arrested psychological development along with his

9    long-term issues of alienation and impaired and strange

10   thought processes are genuine.  Then he goes on to say,

11   "At the very least, this scenario suggests very strong

12   mitigating factors."  I give that no weight because it's

13   not my job to give a defendant psychological tests.

14   That's the doctor's job, and it's not his job to tell me

15   what mitigating factors are.  That's my job.

16      So I'm totally discounting his last sentence.  I

17   happen to agree with him but not because he stated it.

18   It's because I made my own independent judgment that

19   those are mitigating.  But my question for you is are

20   those things supported by the record, and are they

21   mitigating.

22          MR. TREMMEL:  Your Honor, his poor judgment is

23   not mitigating if his poor judgment is what leads him to

24   have sex with a 12-year-old.  Neither is his lack of

25   impulse control.  His perpetual lower self-esteem is

 1   mitigating to an extent in terms of his arrested

 2   psychological development.  I don't know to what extent

 3   we would agree with that, but his long-term issues of

 4   alienation and impaired and strange thought process,

 5   doctor says those are genuine based in part on things

 6   that the defendant said in the interview that we weren't

 7   aware of in prior records.  So to the extent those things

 8   are true, they could be somewhat mitigating.  But

 9   overall, I don't think the totality of all those factors

10   listed are significantly mitigating.

11           THE COURT:  Okay.  I just want to clarify your

12   comments.  With regard to poor judgment and lack of

13   impulse control, I thought you said they were not

14   mitigating.  Then at the end I thought you may have said

15   they could be mitigating but not significantly

16   mitigating.  So just clarify that for me.  What's the --

17   what's your position?

18           MR. TREMMEL:  Well, on the poor judgment and

19   lack of impulse control, if -- I don't think his poor

20   judgment in committing this offense and the lack of

21   impulse control is mitigating.  I think if he's got

22   issues with his family and long-term issues of alienation

23   and such things making his life more difficult, I think

24   this Court has recognized those types of issues as

25   mitigating in the past.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Reported with computer-aided transcription*

Case 1:16-cr-00057-CJW-MAR   Document 94   Filed 08/20/20   Page 60 of 71

```
 1        So I think when you weigh all of those factors
 2   together that are listed, some mitigating and some not, I
 3   would disagree that it's very strong mitigating factors
 4   as Dr. Konar argues.
 5             THE COURT:  Okay.  Now, almost every criminal
 6   that you see and that I see and that Mr. Nathan sees,
 7   they have poor judgment and poor impulse control.  That's
 8   one of the big reasons that separates people who commit
 9   crimes from people who don't commit crimes.  It can still
10   be mitigating just because almost every defendant has
11   poor judgment or poor impulse control.  It can be
12   mitigating.  I don't consider it mitigating in general
13   if -- if the defendant was 40 years old, his poor impulse
14   control would not be mitigating.
15        But I consider it mitigating in this case because
16   the science overwhelming says that a person of his age at
17   the commission of the crime, 19 years old, his prefrontal
18   cortex, particularly his dorsolateral prefrontal cortex
19   which controls executive functioning, is clearly not
20   developed by age 19.  It doesn't really fully develop
21   till -- for a Caucasian male until they're in their mid
22   20s.  25, 26, it becomes fully developed.  So that's what
23   he was relying on when he cited to the Teen Brain Still
24   Under Construction, National Mental Health of Institute
25   monograph.
```

       1         But if -- accept for a moment it's true that for

       2    most 19-year-old males their brain is not fully developed

       3    because their prefrontal cortex is not fully developed

       4    and that leads to poor impulse control.  Why on earth

       5    would that not be mitigating?

       6              MR. TREMMEL:  Your Honor, I don't see most

       7    19-year-olds having sex with 12-year-olds, and so I just

       8    don't think the fact that he's 19 years old and the

       9    prefrontal cortex issues the Court has identified, that

      10    that makes it mitigating, but I understand that's the

      11    Court's position and that will go into the Court's

      12    judgment on this.

      13              THE COURT:  Yeah, you're right.  Most

      14    19-year-olds do not have sex with 12-year-olds, thank

      15    God.  But most 19-year-olds engage in conduct

      16    demonstrating poor impulse control.  Whether they get

      17    caught by law enforcement or not is another issue.  But

      18    that's just a fact.  It doesn't justify what he did.  You

      19    know, he's not going to get a get-out-of-jail-free card

      20    and walk out of this courtroom with probation.  Even if

      21    there wasn't a mandatory minimum, I would sentence him to

      22    a significant term of imprisonment.  But to say it's not

      23    mitigating, we'll just have to agree to disagree on that

      24    one.  Thank you.

      25         Anything else either lawyer would like to add?

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Reported on Federal Computerized Transcript*

Case 1:16-cr-00057-CJW-MAR   Document 84   Filed 08/20/20   Page 62 of 71

```
 1              MR. NATHAN:  No, Your Honor.
 2              THE COURT:  Okay.  Mr. Konigsmark, you have the
 3    right to say anything to me you want to before I impose
 4    sentence.  You have a right to remain silent, so you
 5    don't have to say anything.  If you exercise your right
 6    to remain silent, I will not hold that against you in any
 7    way.  Sometimes when defendants give up their right to
 8    remain silent and say something, it helps them.
 9    Sometimes it actually increases their sentence, and
10    sometimes it has no impact.  So what would you like to
11    do?
12              THE DEFENDANT:  I'd like to speak, Your Honor.
13              THE COURT:  Okay.  Thank you.
14              THE DEFENDANT:  Thank you.  Your Honor, I'd
15    like to apologize directly to the victims that were
16    involved in this crime.  I understand that -- understand
17    the seriousness of it, and I take full-on responsibility,
18    and I do not blame anybody else but myself.
19        I also would like to apologize to the Cedar Rapids
20    Community School District for my actions and my family
21    and friends.  I can't thank them enough for still
22    supporting me and still having faith in me and still
23    watching over me.  That would be it, Your Honor.
24              THE COURT:  Okay.  Thank you.
25              THE DEFENDANT:  Thank you.
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Reporter's Certificate Filed 08/20/20*
Case 1:16-cr-00057-CJW-MAR   Document 64   Filed 08/20/20   Page 63 of 71

1    THE COURT:  Can I get one clarification I think

2  from the lawyers?  I'm pretty tech savvy, but I'm a

3  little bit behind the times lately.  So I do have a

4  Twitter feed, and, you know, I have a Facebook page.

5  Snapshot (sic), no, I don't.  Instagram, yes.  Snapshot,

6  no.  Is Snapshot the one where the picture actually

7  disappears after a few seconds or something?

8    MR. NATHAN:  Yes, Your Honor.  And the defense

9  maybe didn't do a good-enough job of this, but in the

10 sentencing memo --

11   THE COURT:  I thought you did that.

12   MR. NATHAN:  -- we did footnote that it deletes

13 automatically after ten seconds unless you what I'll

14 call --

15   THE COURT:  You can do something to --

16   MR. NATHAN:  You screen shot.

17   THE COURT:  You take a screen shot, and then

18 you can actually forward the screen shot to somebody

19 else.

20   MR. NATHAN:  Right.

21   THE COURT:  And that was my point.  That wasn't

22 done in this case.

23   MR. NATHAN:  There's nothing in the record --

24   THE COURT:  There's no evidence that it was

25 forwarded to anybody else which would make it

 1    substantially more aggravating; right?

 2              MR. NATHAN:  Correct.

 3              THE COURT:  Okay.  Okay.  Thanks.  I'm ready to

 4    rule.

 5         I'm granting the defendant's motion for a downward

 6    variance.  I have a number of reasons for my variance

 7    decision.  The fact that the defendant has no prior

 8    criminal history is mitigating, although that's taken

 9    into account in the criminal history category 1.  As I've

10    said on several occasions, there's a criminal history

11    category 1 and a criminal history category 1.  Sometimes

12    you see multiple convictions that aren't scored for any

13    reason.  Here he's a pure criminal history category 1.

14    And the Eighth Circuit has said that you can consider

15    that as part of a downward variance, but it doesn't

16    justify a large downward variance, so it's a very small

17    part of the reasons why I'm varying.

18         The substantial reasons for my variance are exactly

19    what the government and I disagree with, and that would

20    be the paragraph on page 10 of Dr. Konar's report.  I

21    think the defendant's poor judgment, lack of impulse

22    control, perpetual lower self-esteem, and arrested

23    psychological development didn't cause the crime, but

24    they were directly related to the commission of the crime

25    and factors that contributed to the crime and are, in my

 1   view, substantially mitigating.

 2        If Mr. Konigsmark was a 40-year-old man, very few of

 3   those factors would apply, but he was 19 years old at the

 4   time he committed the crime, and I think I would be

 5   extremely negligent in my duties if I didn't take that

 6   into consideration in forming the judgment about what an

 7   appropriate sentence is.

 8        Other mitigating factors would include -- I think

 9   there's a very low likelihood of reoffending.  The fact

10   that Mr. Konigsmark was honest with the police in the

11   interview and cooperated with law enforcement is

12   mitigating, and I think it helps establish that he's got

13   a greater likelihood of rehabilitation.  I don't think he

14   minimized in his discussions with law enforcement.  I

15   guess one could argue that there was some minimization in

16   the psychological report, but that was probably due to

17   the questions that were either not asked or not fully

18   developed.  It wasn't due to anything that would be

19   attributable to the defendant.

20        Defendant's lack of a stable childhood and lack of

21   parental supervision and upbringing is definitely

22   mitigating, and the defendant's lack -- young age even

23   without the strong neuroscience evidence of a lack of

24   fully developed prefrontal cortex is strongly mitigating.

25   So those are the mitigating factors.

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
*Reporter's Certified Transcript*
Case 1:16-cr-00057-CJW-MAR   Document 94   Filed 08/20/20   Page 66 of 71

1    In terms of aggravating factors, the fact that three

2    girls were involved in the offense is aggravating, but

3    there was an enhancement for that I believe.  And the

4    fact that he used his duties on the school bus or in

5    connection with the school bus to connect with these

6    three girls is an aggravating factor.  But that was taken

7    into consideration in the guideline calculations.  And

8    those -- you know, but for those two aggravating factors,

9    I would sentence at the bottom of the guideline range of

10    120 months, but I think they are aggravating.

11    But I think the mitigating factors that I've

12    outlined substantially outweigh the aggravating factors

13    in this case.  And my job in sentencing is to weigh the

14    aggravating and mitigating factors.  And, you know, we

15    have to weigh that which cannot actually be measured, put

16    it on a balance and make our best judgment.

17    It's my judgment that you are hereby committed to

18    the custody of the Bureau of Prisons to be imprisoned for

19    132 months.  That's my best judgment about a sentence

20    that is sufficient but not greater than necessary to

21    achieve all of the sentencing purposes.

22    We didn't really discuss the length of supervised

23    release.  Can be anywhere from five years to life.

24    Mr. Tremmel, what does the government recommend?

25         MR. TREMMEL:  Whatever the Court deems

```
 1   appropriate, Your Honor.

 2            THE COURT:  How about the defense?

 3            MR. NATHAN:  We'd ask for the minimum, Your

 4   Honor.

 5            THE COURT:  I think I'm going -- given the fact

 6   that I gave a substantial variance, I think I'm going to

 7   go beyond the minimum and impose a term of ten years of

 8   supervised release.  After you -- if you successfully

 9   complete half of it, then you're eligible to ask

10   probation to ask the judge to reduce your term of

11   supervised release, but I think given all of the factors

12   ten years of supervised release is appropriate.

13       You'll have the standard conditions set forth in

14   your judgment, and you'll have some special conditions

15   that are set forth in the presentence report, paragraphs

16   92 to 103.  There are no objections to it.  So all of

17   those special conditions are imposed.

18       You don't have the ability to pay a fine, so the

19   fine is waived.  There's a hundred-dollar special

20   assessment due and owing.  And there's also a $5,000

21   special assessment that's due and owing.

22       Does the defense have any objection to the

23   imposition of that?  There is that $20,000 CD that was

24   reflected in the presentence report, so I think he does

25   have the ability to pay that.  Do you have any argument
```

1  about why I shouldn't impose it?

2         MR. NATHAN:  No, Your Honor.  The CD is a basis

3  to impose it.

4         THE COURT:  Okay.  Then I'm going to go ahead

5  and impose the $5,000 special assessment required by

6  Title 18 section 3014.  You're remanded to the custody of

7  the United States marshal.

8      You have a right to appeal the decision that I

9  imposed.  If you decide to appeal, you need to file a

10  written notice of appeal with the clerk of this court no

11  later than 14 days from the date the judgment is filed.

12  If you can't afford to pay for a lawyer, pay the costs of

13  an appeal, those costs will be paid on your behalf.

14      I'd ask the U.S. marshals to accommodate a family

15  visit if that can be done.

16      Anything further on behalf of the defendant,

17  Mr. Nathan?

18         MR. NATHAN:  Should I ask for a BOP placement

19  now, Your Honor?

20         THE COURT:  Yes.

21         MR. NATHAN:  So the PSR does indicate that

22  Mr. Konigsmark had some, I believe, blood in his urine.

23  And I did speak to the government before and informed

24  them that when it came time to ask for BOP placement that

25  I would cite just some recent hospital records the

```
 1   defendant received from UIHC that he was just seen there
 2   earlier last month, and they are recommending further
 3   testing, a CT urogram which I believe --
 4              THE COURT:  Because of his one kidney?
 5              MR. NATHAN:  Right.
 6              THE COURT:  Right.
 7              MR. NATHAN:  And so we would ask based on that
 8   for placement at FMC Devens which also, I believe, offers
 9   sex offender treatment program.
10              THE COURT:  It does, that's right.
11              MR. NATHAN:  So we'd ask for placement at FMC
12   Devens, Your Honor.
13              THE COURT:  Does the government have any
14   objection?
15              MR. TREMMEL:  No, Your Honor.
16              THE COURT:  Okay.  I'll make that
17   recommendation to the Bureau of Prisons.  Thank you.
18   Anything else on behalf of the defense?
19              MR. NATHAN:  No, Your Honor.  Thank you.
20              THE COURT:  Mr. Tremmel, anything else on
21   behalf of the United States?
22              MR. TREMMEL:  No, Your Honor.
23              THE COURT:  Okay.  Thank you.  We'll be in
24   recess.  I'm running behind.
25              (The sentencing was concluded at 11:35 a.m.)
```

*Contact Shelly Semmler at 712-233-3846 or shelly_semmler@iand.uscourts.gov*
Case 1:16-cr-00057-CJW-MAR   Document 84   Filed 08/20/20   Page 70 of 71
*Reported mechanically; transcribed using CAT software*

```
 1                          CERTIFICATE

 2          I certify that the foregoing is a correct

 3    transcript from the record of proceedings in the

 4    above-entitled matter.

 5        S/Shelly Semmler                  8-4-20
           Shelly Semmler, RMR, CRR          Date
 6

 7

 8                             INDEX

 9    WITNESS:                                    PAGE:

10    ARTHUR KONAR
         MR. NATHAN                                 8
11       MR. TREMMEL                               24
         MR. NATHAN                                38
12
                           * * * * *
13

14    EXHIBIT:                                    PAGE:

15       A through E                               6

16                         * * * * *

17

18

19

20

21

22

23

24

25
```